(68 App. Div. 531.)

BELL v. MILLS.

(Supreme Court, Appellate Division, Fourth Department.   January 7, 1902.)

**1. SEEDSMAN—QUALITY—WARRANTY—DUTY OF PURCHASER.**

A seedsman guarantied, in his catalogue and card accompanying the seed, that seed oats should be delivered in good condition, and stated in both that he exercised the greatest care to have his seeds pure and clean, that if not as represented he would refill the order, and that if the oats were not accepted on these terms they must be returned at once. The oats contained a large quantity of mustard seed, which was easily discoverable by spreading the oats on a flat surface, or even on the hand.   *Held,* that there was no express or implied warranty of the quality of the seed.

**2. SAME—PURCHASER'S DUTY OF INSPECTION.**

It was a purchaser's duty to inspect the oats for foreign seeds, and on his sowing the seeds without due inspection no warranty could be insisted on.

**3. SAME—EXAMINATION—DISCOVERY OF FOREIGN SEEDS—EVIDENCE—FINDING.**

Where a purchaser of seed oats merely opened one of several sacks, and, taking a handful of the oats, noticed the size and color before turning them over to his servant to be sown, and there was a large quantity of mustard seed evenly distributed through the oats, which was readily distinguishable on spreading the oats thinly on any flat surface or even on the hand, a finding that the purchaser made a reasonable examination, and that such foreign seeds were not discoverable, was not justified.

**4. SAME—CONTRACT—ACCEPTANCE—WAIVER OF WARRANTY.**

Where a purchaser of seed oats, under a contract that he should immediately return them if not found as represented, sowed the oats after discovering foreign seeds mixed therewith, he thereby accepted them discharged of any implied warranty against foreign seeds.

**5. SAME—EXTENT OF INQUIRY—EVIDENCE—VERDICT.**

Where, in an action against a seedsman for damages resulting from the sowing of seed oats purchased of him which were mixed with mustard seed, it appeared that the oats and mustard were plowed under before going to seed, and the ground harrowed from time to time until September 1st, and substantially no mustard plants appeared from that time until the trial of the action, the following April, the testimony of so-called "experts," that it was likely that all the mustard seed had not sprouted, and that it could not certainly be known that the mustard was entirely eradicated for five, and perhaps ten, years, does not justify a verdict for nearly the full value of the land.

Appeal from trial term, Niagara county.

Action by William H. Bell against Frank B. Mills.   From a judgment for plaintiff, and from an order denying a new trial, defendant appeals.   Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Lewis & Crowley, for appellant.
Brong & Jeffery, for respondent.

WILLIAMS, J.   The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event.

The action was brought to recover damages caused by the introduction of the seed of wild mustard into the plaintiff's farm by the

sowing of oats purchased of defendant. Plaintiff's farm was near Lockport, and contained 100 acres, 22 of which were sowed to the oats in question. The defendant lived near Syracuse, and carried on a large seed business. Early in the year 1900 he issued a catalogue in his business, and on the first page thereof was the following:

"My Guaranty: I guaranty that all seeds and other goods sent out from my establishment shall reach the purchaser safe, in good condition, be fresh and true to name, to grow if properly planted, and, if such should not prove the case, I will refill the order free of charge, providing sufficient proof is given me within a reasonable time. I cannot guaranty crops, and will not be responsible for them."

He also advertised in the catalogue a variety of oats called the "Record Breaker," and said of them:

"After reading the experiences of my customers in growing this oat, is there one that can doubt that this is going to be a leading variety? Order early, for you certainly cannot make a mistake. Price of choice stock, well cleaned, as follows," etc.

The plaintiff received this catalogue sent him by the defendant, read the guaranty and the advertisement of the "Record Breaker" variety of oats, and April 12, 1900, ordered by mail 60 bushels of the oats, paying therefor $36. The oats were received by the plaintiff about May 4, 1900, put up in 20 bags, each bag containing 3 bushels. In each bag upon the oats was a card reading as follows:

"Oats, Record Breaker. I exercise the greatest care to have all my seeds, potatoes, bulbs, and plants, etc., fresh, pure, clean, and true to name, and if such should not be the case I will refill the order, free of charge, providing sufficient proof is given me within a reasonable length of time. I cannot guaranty crops, and will not be held responsible for them. If these goods are not accepted on these terms, they must be returned at once.
                              "F. B. Mills, Fair View Seed Farm."

The plaintiff took the oats to his farm, and into his field, opened some of the bags, and saw and read one of the cards. He and his hired man took some of the oats up in their hands, and looked at them, observing that they were plump, and looked well, but made no further inspection or examination of them. Some of the bags of oats were separated, one-half of each bag being emptied into another bag, and they were then distributed about the field convenient for use, and the hired man was left to sow the oats with a drill, which he at once commenced to do. The plaintiff left the field, and was not present while the sowing was being done, until it was nearly finished. The hired man worked parts of three days in sowing 44 bushels of the oats on the 22 acres. Rain prevented his working full days. The middle of the third afternoon, and when the hired man had got three acres to sow, he discovered foreign seeds in the oats. This was the first that they had been noticed. The plaintiff was away, and the hired man continued the sowing. He did not know what the seeds were. Just before he had finished, and when he had still one bout to sow, the plaintiff came into the field, was told by the hired man that he had discovered the seeds, and then himself took some of the oats in his hands, run them over, and saw and examined the seeds. He did not know what they were, and directed the hired man to finish the field, which he accordingly did.

The seeds were small and black, and were first discovered when some of the oats were turned upon a flat surface of the cover of the drill. They could readily be observed by putting some of the oats on any level surface, or even upon the hand, and moving them about. After sowing the 22 acres, and using about 44 bushels of the oats, there were 16 bushels left. The plaintiff when he ordered the oats intended to use himself only 44 bushels, and to let his son have the remaining 16 bushels. The son took the oats designed for him, and sowed them upon his land. Before doing so, however, he and the plaintiff caused a part of them to be put in a sieve, and a quantity of the foreign seeds to be removed therefrom. None of the oats were returned, or offered to be returned, to the defendant.

A correspondence took place between the parties, of which the following is a brief synopsis: May 11, 1900, plaintiff wrote the defendant, inclosing a package of the foreign seeds, and one of the cards found in the bags of oats, asked what the seeds were, and said they did not discover them till sowing was nearly finished, and then with a sieve took out of eight bushels of the oats at least a quart of the seeds. May 18, 1900, the defendant wrote the plaintiff that he could not, on examination, say certainly what the seeds were; that he would test them, and see what they were, and would like to have plaintiff report to him if anything came up; that he was very careful to have his oats perfectly clean, and could not see how as much foreign seed could have gotten in them. June 6, 1900, the plaintiff wrote the defendant that they had carefully examined the plants growing from the foreign seeds in the oats, and were satisfied that they were mustard; that the seeding was a damage to him, having bought, as he supposed, perfectly clean oats, and asking defendant to send a representative to see the field. June 11, 1900, the plaintiff's attorneys wrote defendant that there were noxious weeds in the oats sowed, and it became necessary to plow up the crop to prevent the foul matter from going to seed; that three or four days would be given defendant to see the existing condition before the plowing was done; and that plaintiff would make a claim for damages. The defendant seems to have sent a representative to examine the field, and June 16, 1900, he wrote plaintiff that upon the return of his representative he found the foul weeds were mustard; that it was a mystery how the foul seeds got in the oats, and if plaintiff was certain they were in them when received he could procure help immediately, and pull the mustard before it seeded; that his representative said this could easily be done, and would be the surest way to get rid of it; that he had a fine piece of oats, and the mustard could be pulled out at a good deal less expense than the crop could be plowed under and something else put in; and that, if plaintiff would furnish him proof that the seeds were in the oats, he would pay for the labor to clean the mustard out. June 19, 1900, plaintiff's attorneys wrote defendant, in answer to his letter to plaintiff, that there seemed to be no doubt that the mustard came from the seed oats, and they would be able to furnish him proof of the same at any time it became necessary; that plaintiff found it was impossible to weed it out, and had de-

termined upon plowing it up, and working it, with a view to getting rid of the foul stuff, and would commence in two or three days, as it was growing and increasing every day; but if defendant thought it could be weeded out, and would do so, and guaranty the crop and land free from mustard seed, he would be pleased to have him do it; to give it his immediate attention, or plaintiff would commence to turn the crop under in a few days. June 20, 1900, the defendant answered the attorney's letter, saying that his representative examined the field very carefully, and told defendant that he did not think the mustard seed was in the oats when shipped, as he was positive the oats were pure and clean, but did not know what happened to them after they left his warehouse; that they had shipped several thousand bushels from the same lot, and there was no mustard seed in them, and the purchasers were perfectly satisfied, and said they were the cleanest lot they ever had, and, if the oats shipped to plaintiff were full of mustard seed, why were they not returned in accordance with the card in each bag; that instead of this the plaintiff sowed them, and thereby relieved the defendant from liability; that it was a great mistake to plow the oats under; that the only safe way to get rid of every spear was to pull the mustard, and plaintiff should get help and do it; that he might have to go over the field more than once, but they could clean it out with very little expense; that he wrote plaintiff he would pay this expense, if it could be proved the seeds were in the oats when they left his warehouse; that if plaintiff insisted on plowing up the crop he did so at his own expense, because it was unnecessary, and the defendant would entertain no claim of that kind, etc. June 20, 1900, plaintiff's attorneys replied to defendant's letter, saying that, in view of the difference of opinion as to the most practical method of eradicating the mustard in the oats, plaintiff would turn the field over to defendant, to dispose of in the best and cheapest way he could; otherwise, plaintiff would adopt such practical method as to him seemed the best and cheapest; and asked defendant to give the matter his immediate attention, and advise definitely what he would do. July 5, 1900, plaintiff's attorneys wrote defendant again, saying one Cummings some time before was there, and solicited a proposition for the settlement of plaintiff's claim, and asking whether plaintiff's proposition was communicated to defendant, and requesting reply at once. July 11, 1900, defendant wrote plaintiff's attorneys that his representative went to plaintiff, and offered to pay the expenses of pulling the mustard, thereby making the field all right; that he did this, though he was positive that there were no mustard seeds in the oats when sold to plaintiff, and he was prepared to prove it; but plaintiff refused to allow defendant to do this, or to make any proposition he could consider; that plaintiff wanted $600 damages for that year, and $1,000 for all damages, but he did not intend to pay any such amount as plaintiff demanded, etc. The plaintiff thereupon, July 24, 1900, commenced this action. He plowed the crop under, and cultivated the field from time to time during that season, to prevent the mustard from going to seed, the last cultivation being about September 1, 1900. The action was

tried in April, 1901, and upon the trial the plaintiff testified that
nothing had been done to the field since the cultivation, in Sep-
tember, and he had not noticed any mustard in the field since that
time. Evidence was given by other witnesses, however, that after
September 1, 1900, they saw some few plants of mustard in the
field. Evidence was given on the trial by several experts, who ex-
amined the field after the crop came up, and testified there was a
very thorough seeding of mustard, the plants covering the whole
field, and being very close together. They expressed the opinion
that the most effectual way of getting rid of the mustard was by
plowing and cultivating the field, that all the seeds might not sprout
the first year, and that the mustard could not be certainly eradi-
cated under five or ten years. Some proof was given as to the
amount of work performed in plowing and cultivating the field,
and the value of labor in the locality, but it did not appear what the
loss to plaintiff was from the failure of the crop and the labor per-
formed upon the field. It appeared that the plaintiff paid the de-
fendant for the 44 bushels of oats sowed upon the 22 acres $26.40,
and that the whole value of the 22 acres was $45 per acre ($990).

The court charged the jury that there was no express warranty
of the oats, but that there was an implied warranty that they were
free from any noxious seeds not discoverable by a reasonable in-
spection and examination, and submitted to the jury the question
whether the mustard seeds were so discoverable.

The appellant contends: (1) That the contract for the sale of the
oats, as proposed by the defendant, was contained in the card ac-
companying the oats; that this contract was completed on the part
of the plaintiff by accepting and sowing the oats, after an opportunity
to examine and inspect them; and that, in view of the terms of such
contract, no warranty could be implied. (2) That, if any warranty
could be implied, it was not such a one as suggested by the court,
and as would survive the acceptance of the oats, inasmuch as a rea-
sonable examination and inspection thereof would have discovered
the presence of the mustard seed. These questions were clearly
raised by exceptions to the charge as made, and to refusals to charge
as requested.

We are unable to see how there could be any implied warranty at
all, under the contract of the parties. There can be no doubt as to
what the contract was. No fraud or deception was claimed. The
catalogue and the card accompanying the oats together constituted
an offer by the defendant to sell and deliver the oats on certain terms.
The guaranty in the catalogue was that the oats should be delivered
in good condition. The card stated that the defendant exercised
the greatest care to have his seeds, among other things, pure and
clean. In both the catalogue and card the defendant stated that, if
the seeds were not as represented, he would refill the order, provid-
ing sufficient proof was given within a reasonable time; that he could
not guaranty the crop, and would not be responsible for it; and then
in the card he expressly provided that, if the oats were not accepted
on these terms, they must be returned at once.

The oats having been shipped to and received by the plaintiff under

this offer, he was called upon, before he accepted and sowed the oats, to examine and inspect them, not only as to the general appearance of the seeds themselves, but as to their being pure, clean, and free from noxious seeds; and if they were found to be not as represented, but to contain foreign seeds, he must refuse to accept them, or to complete the contract, and could then take advantage of the provision in the offer to have his order refilled. He could not accept and sow the oats, without examination and inspection, thus completing the contract, and then rely upon any implied contract as to the purity of the oats, for the breach of which he could recover damages for the introduction into farm of the noxious weeds. Nor are we able to see how, in any event, an implied warranty as to the purity of these seed oats would survive the acceptance and sowing of the same, under the evidence in this case. Concededly, the plaintiff, upon receipt of the oats, was called upon to make a reasonable examination and inspection thereof before sowing the same, and a warranty would only be implied as to defects which were not discoverable upon such reasonable examination and inspection. The plaintiff made substantially no effort to discover whether the oats contained any foreign or noxious seeds. All he did was to observe casually the general condition of the oats themselves; that they were plump, good-looking oats. The mustard seeds were freely distributed through the whole lot of oats, so that the plants therefrom sprung up over the whole field upon which the oats were sowed, close together. A large quantity was readily taken from the eight bushels of oats which were put in the sieve. The seeds could be easily discovered by placing the oats upon any level surface, even flat of the hand, and moving them about. Under these circumstances, how can it be said that any warranty that the oats were pure and free from any noxious seeds could be implied by the trial court? that such noxious seeds were not discoverable by a reasonable examination and inspection? This question was submitted to the jury, it is true, and they must have found that the plaintiff made a reasonable examination and inspection of the oats, and that the foreign, noxious seeds were not discoverable upon such an examination and inspection. We cannot, however, regard such a finding as warranted or authorized by the evidence given on the trial.

Another objection to a recovery is that, after the plaintiff discovered the presence in the oats of the foreign seeds, he continued to use them, sowing three acres of his own land, and turning 16 bushels over to his son, who sowed them upon his land. This case did not, therefore, rest upon the proposition that the plaintiff retained the oats, and did not return them to the defendant, while in ignorance of the presence of foreign seeds. He retained and sowed, or allowed his son to sow, 20 bushels thereof after he concededly discovered the presence of the foreign seeds. This would seem to constitute an acceptance under the contract, which no implied warranty of the oats would survive.

Again, the damages awarded by the jury under the circumstances were excessive. The measure of damages charged by the court was correct, as a general proposition,—the amount paid for the oats

sowed upon the 22 acres, and the difference in the vlaue of the whole farm of 100 acres, by reason of the introduction of the mustard seed into the 22 acres. The difficulty was in the application of the rule to the evidence in the case. The plaintiff sowed the oats upon 3 of the 22 acres, with a knowledge that there were foreign seeds therein. He did not know the seeds were noxious, but he sowed them in disregard of the danger to be apprehended in sowing upon his land seeds the nature of which he did not know. It was plaintiff's duty, when he discovered the injury done to his land by the introduction of mustard, to do whatever he could to make the damages as little as possible. He was asked by the defendant to employ help and pull the mustard plants before they went to seed, and the defendant finally offered to pay the expense thus incurred, regardless of his legal liability to do so. The plaintiff refused to treat the land in this way, but proceeded to plow the whole crop under, and to harrow the field thereafter, making at the same time a claim for $1,000 damages to his farm. The crop of oats was thereby destroyed, and the plaintiff had no more use of the 22 acres that year. Very likely it was for the jury to determine whether the plaintiff acted in good faith in plowing and harrowing the land rather than pulling the mustard plants, and which was the better method to get rid of the mustard; but what evidence was there upon the trial that the treatment given the land had not substantially eradicated the mustard seed from the 22 acres? Merely the evidence of so-called "experts" that it was likely that all the mustard seeds had not sprouted, and would yet produce mustard plants, and that it could not certainly be known that the mustard was entirely eradicated for five, and perhaps ten, years. The season of 1900 had passed. It was April, 1901, when the trial took place. Substantially no additional plants had appeared after the final harrowing the first part of September, 1900, and yet it was said other plants might appear thereafter,—would very likely appear,—and upon the theory that they would so appear, and could not be eradicated from the 22 acres by pulling the plants, or plowing and harrowing the field, but would extend over the whole farm, witnesses testified that in their opinion the damage to the whole farm was from $2,000 to $3,000. The jury showed their appreciation of the opinions of the witnesses by rendering a verdict for only $900. We are unable to see how, under the circumstances of this case, the damage could have amounted to anything like $900. The full value of the 22 acres was only $990. It may be true that no treatment of the field could eradicate the mustard, and that it would necessarily extend over the whole farm, but, so far as appeared on the trial, the plowing and harrowing of the field in 1900 did substantially eradicate the mustard therefrom. Assuming that some plants would appear the following season, still it seems as though, by some care and attention for a year or two, every plant and seed could be disposed of, and the farm entirely relieved therefrom. A new trial will be had, however, and it will then be possible to show, what did appear in the season of 1901, what treatment the plaintiff gave the field, and what the result was. If, then, a recovery shall be had at all, the amount of damage can be determined more satisfactorily than upon the former trial.

Our conclusion is that the judgment and order appealed from should be reversed, and a new trial ordered, with costs to appellant to abide event. All concur, except SPRING, J., who concurs in the result, upon the ground that the damages were excessive upon the proofs.